**SO ORDERED.**

**SIGNED this 12 day of April, 2012.**



_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| LEONARD ANTHONY GILMAN<br>CHELSEA TERRELL GILMAN | 11-06036-8-SWH |
| DEBTORS | |

### ORDER ALLOWING MOTION TO DISMISS

The matter before the court is the bankruptcy administrator's motion under 11 U.S.C. §§ 707(a), 707(b)(1), and 707(b)(3), to dismiss the debtors' chapter 7 case. The debtors responded and a hearing took place in Raleigh, North Carolina, on February 28 and March 1, 2012. At the conclusion of the hearing, the court announced that it would take the matter under advisement.

### Jurisdiction

This court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), which this court may hear and determine.

**Background**

Leonard Anthony Gilman and Chelsea Terrell Gilman filed a joint petition for relief under chapter 7 of the Bankruptcy Code on August 6, 2011. On October 19, 2011 the bankruptcy administrator filed a motion to dismiss pursuant to § 707(b), or in the alternative, pursuant to § 707(a). The schedules list liabilities consisting of personal consumer debts as well as business debts related to the debtors' ownership of C & L Holding, Inc., an upholstery distributor ("C & L Holding"). The schedules show total secured debts of $447,826.44 and total unsecured debts of $142,504.29. The case has been designated as a "no asset" case.

The male debtor has been employed as Vice President of Sales for Water Transportation Alternatives, a tourism company, since October 2010. Prior to October 2010, both the male and female debtor owned and operated C & L Holding. The debtors acquired C & L Holding's predecessor, Fiber Sales, Inc., on May 30, 2008. The debtors' obligation to Fiber Sales for the purchase of the company (the "Fiber Sales Judgment") constitutes their largest unsecured debt in the amount of $116,972.07. The debtors had agreed to purchase the company for about $350,000; they paid $250,000 in cash up front and agreed to pay the remaining balance in full within a year. They have made no payments on the remaining balance. The debtors closed C & L Holding in February 2011. The female debtor has been unemployed since the business closed.

The debtors have been unable to produce documents related to the finances of C & L Holding because the debtors destroyed all of the business records within six months of closing the business. C & L Holding wrote checks to "cash" amounting to $81,000 within six months of closing. The debtors testified these checks were used to pay off vendors of the business.

The debtors' combined annual income has increased dramatically in the past three years. In 2009 they earned $9,500, in 2010 they earned $58,084, and in 2011 they earned $91,300. To supplement their earnings in 2009 and 2010, the debtors received unemployment compensation in the amount of $20,809 and $5,309 respectively. However, testimony at the hearing revealed average monthly expenses in the amount of about $17,500.[1]

The debtors have three children: two sons ages 13 and 16, and a daughter, age 20, from the male debtor's previous marriage. The daughter attends college and lives in Florida. The debtors provide some support to her and for purposes of the means test they are considered a household of five. The debtors' sons are heavily involved in sports, and their participation in sports activities is funded by the debtors. The older son plays football and has received interest from college scouts. The debtors spend approximately $600 per month on trainers for him. The youngest son has played golf since he was around 8 years old. The debtors spend approximately $400 per month for golf club dues.

The debtors have taken their family on two trips since the filing: one to Bermuda and one to the Biltmore House in Asheville, NC. The family also traveled to Texas just prior to the filing.

## Discussion

A motion to dismiss a chapter 7 case may be brought for cause under § 707(a) or for substantial abuse under § 707(b). While the bankruptcy administrator brought the present motion under § 707(b) and in the alternative § 707(a), the court will proceed first with the § 707(a)

---

[1] The Court assumes that money is being made available to the debtors from family or other sources in order for them to cover $17,500 per month in expenses on a $91,300 annual salary. Some portion of the expenses may be business related and are being funded through the male debtor's business expense reimbursement.

3

analysis.[2] Section 707(a) of the Code states that a court may dismiss a chapter 7 case "after notice and a hearing only for cause," without expressly defining "cause." 11 U.S.C. § 707(a). Instead it provides three non-exclusive examples of "cause" for discretionary dismissal including:

> (1) unreasonable delay by the debtor that is prejudicial to creditors; (2) nonpayment of any fees or charges required under chapter 123 of title 28; and (3) failure of the debtor in a voluntary case to file, within fifteen days . . . the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

11 U.S.C. § 707(a). However, "cause for dismissal under § 707(a) has been held to include a lack of good faith in filing the petition." In re Marino, 388 B.R. 679, 682 (Bankr. E.D.N.C. 2008); see also McDow v. Smith (In re Smith), 295 B.R. 69, 74 (E.D. Va. 2003) (holding, after considering the statutory construction of § 707(a), that a debtor's bad faith may constitute cause for dismissal under a totality of the circumstances analysis); Desiderio v. Parikh (In re Parikh), 456 B.R. 4, 20 (Bankr. E.D.N.Y. 2011) (finding that bad faith constitutes cause for dismissal under § 707(a), while acknowledging disagreement among the circuit courts regarding the issue); In re Zick, 931 F.2d 1124, 1126-27 (6th Cir. 1991) (holding that although chapter 7 does not explicitly require good faith, good faith is an implicit jurisdictional requirement, and the lack thereof is a valid basis for dismissal for cause under § 707(a)).

---

[2] An analysis under § 707(b) requires looking first at whether the debtors are debtors "whose debts are primarily consumer debts...." 11 U.S.C. § 707(b). The debtors contend that their debts are primarily business in nature, while the bankruptcy administrator contends that 70% of the debt, or $411,655, is primarily consumer debt as to both debtors. Testimony at the hearing indicated that the promissory note for the largest consumer debt related to their residential mortgage was signed only by the male debtor. The lack of the female debtor's signature on the promissory note could result in the majority of her debt being deemed business related and thus she would not be subject to § 707(b). However, the majority of the male debtor's debt is primarily consumer debt and he would be subjected to a § 707(b)(1) and (b)(3) analysis. This circuit looks to both the majority of the monetary amount of debt and the majority of the claims for a totality of the circumstances test to determine whether debts are primarily consumer debts. See In re Jones, Case No. 08-05676-8-ATS (Bankr. E.D.N.C. Jan. 12, 2009). Because the court finds that dismissal is appropriate under § 707(a), a § 707(b) analysis is not necessary.

Generally, a "debtor's 'bad faith' or 'lack of good faith' is evidenced by debtor's deliberate acts or omissions that constitute a misuse or abuse of the provisions, purpose, or spirit of the Bankruptcy Code." Smith, 295 B.R. 69, 74. In assessing bad faith under this section, this district has adopted a non-exclusive fourteen factor totality of the circumstances test. See e.g., In re Marino, 388 B.R. 679, 682 (Bankr. E.D. N.C. 2008); In re Scott, Case No. 10-00794-8-JRL, 7 (Bankr. E.D.N.C. Aug. 6, 2010). The factors include:

1. The debtor reduces creditors to a single creditor in the months prior to the filing of the petition;
2. The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle;
3. Debtor filed the case in response to a judgment pending litigation;
4. The debtor made no efforts to repay his debts;
5. The unfairness of the use of Chapter 7;
6. The debtor has sufficient resources to pay his debts;
7. The debtor is paying debts to insiders;
8. The schedules inflate expenses to disguise financial well-being;
9. The debtor transferred assets;
10. The debtor's overly utilizing the protections of the Code to the unconscionable detriment of creditors;
11. The debtor employed a deliberate and persistent plan of evading a single major creditor;
12. The debtor failed to make candid and full disclosure;
13. The debts are modest in relation to assets and income; and
14. There are multiple bankruptcies or other procedural "gymnastics."

In re Marino, 388 B.R. 679, 682 (citations omitted). These fourteen factors are intended to serve as a guide, as the court must examine any allegation of bad faith on the facts of the particular case. In re Scott, Case No. 10-00794-8-JRL, 8 (Bankr. E.D.N.C. Aug. 6, 2010). The presence of any one factor is not sufficient for a finding of cause for dismissal, however the presence of multiple factors, when considered together, may suffice. Id.

The ability to repay debts, living an expansive lifestyle beyond one's means, and singling out a major creditor for nonpayment are the primary factors that merit dismissal for abuse under

5

§707(a). See, e.g. In re Marino, 388 B.R. 679 (Bankr. E.D.N.C. 2008) (dismissed for ability to pay and attempt to frustrate one major creditor); In re Fiero, Case No. 08-00287-8-ATS (Bankr. E.D.N.C. May 12, 2008) (dismissed for lavish lifestyle and pre-bankruptcy planning that created nonexempt assets in excess of $278,000); In re Woodburn, Case No. 07-00927-5-ATS (Bankr. E.D.N.C. July 17, 2008) (dismissed for lavish lifestyle). In contrast, where there is no evidence of a lavish lifestyle, expenses are reasonable, and there is no evidence that the debtor paid some creditors but not another, motions to dismiss under § 707(a) have been rejected. See, e.g., In re Scott, Case No. 10-00794-8-JRL (Bankr. E.D.N.C. Aug. 6, 2010); In re Parker, Case No. 08-04126-8-ATS (Bankr. E.D.N.C. Feb. 3, 2009). The bankruptcy administrator asserts ten of the fourteen factors are present in this case and claims that the combination of those factors merits dismissal of debtors' case under § 707(a).[3] The court turns now to an examination of those factors which it deems persuasive.

The record is clear and it is undisputed that the debtors have made no lifestyle adjustments since filing their bankruptcy. In fact, both the male and female debtor testified to this effect at the hearing. On direct the male debtor was asked whether he had "scaled back his expenses" and his response was "no, I probably spend about the same." The female debtor was asked what she had done "to scale back" and her response was "not much." When asked if it was fair to say her spending had even increased since filing, the female debtor's response was "yes." It is these responses which are most troubling to the court in its analysis under § 707(a).

It is equally clear that the debtors' expenses are "expansive," if not "lavish." The debtors have spent on average approximately $17,500 per month on expenses that include: $2,000-3,000 per

---

[3] The bankruptcy administrator asserts that factors 2, 3, 4, 5, 6, 7, 9, 12, and 13 are present.

6

month on food; $400 per month in golf dues; $800 per month to church[4]; $600 per month for their 16-year-old son's personal trainer; $1,000 per month on recreation and miscellaneous spending; and trips to Bermuda, the Biltmore and Texas.

The debtors contend that raising teenagers is expensive and that these expenses are not unreasonable. The expenditures on food and recreation, the debtors state, are within the realm of parental judgment and they add that frequent flyer miles helped reduce the costs of the trips. The court does not agree with the debtors' characterization of their expenses. The savings allegedly obtained on the trips aside, the court views these expenditures, when considered cumulatively, as significant indicia of an excessive lifestyle.

Although there is no requirement in the Code to change one's lifestyle upon filing for bankruptcy, this is a factor for consideration under § 707(a). See Smith, 295 B.R. 69, 80 (noting that a totality test for bad faith focuses on ability to repay and lifestyle). Furthermore, the testimony at the hearing suggested not only that these debtors have not tightened their belts, but that they have loosened them up a few notches. The debtors' income has actually dramatically increased in the past few years, and instead of using this increasing income to pay off their debts, they have chosen to increase their personal expenses. The bankruptcy administrator provided the court with a breakdown of the debtors' bank statements over the last year, which indicated monthly expenditures equal to their increasing monthly income. The debtors are enjoying a very comfortable lifestyle and bankruptcy protection was not intended to assist those who are attempting to preserve such a

---

[4] Although the Code does not permit consideration of certain charitable contributions when assessing whether a debtor has engaged in substantial abuse under § 707(b), § 707(a) does not contain such a limitation. In re Collins, 250 B.R. 645, 654 (Bankr. N.D. Ill. 2000). Under a totality of the circumstances analysis, these monthly donations are part of the bigger picture which the court may consider in making its decision.

lifestyle at the expense of their creditors. The court notes that each of these expenditures alone are insufficient to warrant cause to dismiss, however, in the aggregate they evidence a lavish lifestyle and are not indicative of the good faith actions of persons properly seeking the protections and benefits of chapter 7 bankruptcy.

The court next turns to a consideration of whether the case was filed in response to a judgment in pending litigation. The Fiber Sales Judgment was entered two weeks prior to the debtors' filing and constitutes the debtors' largest unsecured debt. It is the debtors' contention that the filing was not in response to this judgment. The debtors stated that they were trying to work out issues with their mortgage company and held off filing until those issues could be sorted out. They had consulted with their bankruptcy attorney in January 2011, and retained his services in March 2011. The debtors additionally note that a $56,331.44 judgment was entered against them in April 2011 and the Fiber Sales Judgment had not yet been domesticated in Wake County, their county of residence. The debtors believe this is sufficient to indicate that they were planning to file and that the Fiber Sales Judgment was not the reason they chose to file. The court believes that attempting to organize one's affairs before filing for bankruptcy is not bad faith, however the Fiber Sales Judgment was the final catalyst for the filing of the petition. Cf., In re Scott, Case No. 10-00794-8-JRL (Bankr. E.D.N.C. Aug. 6, 2010) (litigation and collection efforts by the creditor had ensued for 8 years before the debtor filed). The debtors' filing is at least partially responsive to the Fiber Sales Judgment.

The bankruptcy administrator contends that the debtor has singled out Fiber Sales to unfairly bear the brunt of its filing. The Fiber Sales Judgment is the only major debt owed by the debtors that would be discharged in the chapter 7. The debtors paid back most of their credit cards pre-

petition, and their combined unsecured debt without this judgment is $25,532.22. By comparison, the next largest unsecured debt is owed to Wells Fargo by the female debtor for credit card debt in the amount of $13,000. Since this is a no-asset case, the unsecured creditors will receive no distribution. While this case involves more than one debt, as noted by the debtors, it is significant that there is only one major unsecured creditor left unpaid in this case, Fiber Sales. It is noteworthy that the debtors never offered to set up a payment plan or make a single payment to Fiber Sales even though the obligation to pay the balance of the purchase price for the business has existed since 2009. In response, the debtors stated that in the ten months preceding their filing, they were planning to file bankruptcy to get rid of certain debts and it would have been imprudent on their part to pay back the debts they were going to discharge. But it is this conscious picking and choosing among creditors that concerns the court. It is at the very core of bankruptcy that not only do debtors get a fresh start, but also that creditors are treated fairly. Debtors are allowed to engage in some pre-bankruptcy planning, but this type of manipulation of their debt which basically leaves one creditor out in the cold certainly is an indication of bad faith. See, In re Marino, 388 B.R. 679 (Bankr. E.D.N.C. 2008) (debtor put her divorce settlement into her IRA account before filing and did not pay lawyers who were responsible for her procuring the settlement); In re Scott, Case No. 10-00794-8-JRL (Bankr. E.D.N.C. Aug. 6, 2010).

  Finally, the bankruptcy administrator contends that the ability to spend an average of $17,500 per month is by itself sufficient to show the ability to pay a dividend to creditors. Congress did not intend for the ability to pay to constitute a sufficient cause for dismissal in and of itself. H.R. Rep. No. 95-595, at 380 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6336; S. Rep. No. 95-989, at 94 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5880. During the hearing, the debtors noted that

under the means test there would be about $400 per month available to creditors, or approximately $24,000 at the end of sixty months. While this does not make a great amount available to their creditors, it does indicate that the debtors could pay something. Furthermore, it is noted that absent certain expenses, which may be extravagant under the circumstances, the debtors could pay more. While the court is not attempting to tell the debtors how to live, it is noteworthy that their monthly expenses are high, and the court can consider the level of expenses as a factor in determining good faith. See In re Falch, 450 B.R. 88 (Bankr. E.D.Pa. 2011).

## Conclusion

The court has avoided passing judgment on the debtors' specific financial choices. However, the court must look at the particular facts of this case in order to determine whether, under the totality of the circumstances, it has been filed in good faith. No one expense or decision of the debtors has driven the court's decision, but a combination of these factors has led the court to find that this filing was not in good faith. The debtors' lifestyle is lavish and rather than attempting to pay off their creditors, they have done everything they can to not only preserve this lifestyle but make it more comfortable. Given their financial situation, such comforts and indulgences without any belt tightening or efforts to pay off their creditors is an improper utilization of the bankruptcy process.

The court is convinced that counsel for the bankruptcy administrator has met his burden of proof by establishing cause to dismiss under § 707(a). Unless this case is converted to chapter 13 within fourteen days, the debtors' case will be dismissed.

**SO ORDERED**.

**END OF DOCUMENT**